**The PEOPLE of the State of Colorado, Plaintiff-Appellee,**

**v.**

**Ernest WALKER, Defendant-Appellant.**

**No. 82SA166.**

Supreme Court of Colorado, En Banc.

June 20, 1983.
Rehearing Denied July 18, 1983.

**115**

J.D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Robert C. Lehnert, Asst. Atty. Gen., Enforcement Section, Denver, for plaintiff-appellee.

J. Gregory Walta, Colorado State Public Defender, Susan L. Fralick, Deputy State Public Defender, Denver, for defendant-appellant.

NEIGHBORS, Justice:

The defendant, Ernest Walker, appeals from the judgment entered by the Denver District Court on guilty verdicts to charges of first-degree assault,[1] aggravated robbery,[2] and conspiracy to commit aggravated robbery.[3] Pursuant to a plea agreement reached after the jury verdicts were returned, the defendant entered pleas of guilty to two of seven counts of habitual criminality.[4]

Walker urges four grounds for reversal: (1) He was denied his constitutional right to testify in defense of the substantive crimes. (2) The in-court identification of him by one of the victims should have been suppressed. (3) All Staff Inspection Bureau files of three police officer witnesses should have been produced for an *in camera* inspection by the trial court. (4) His cross-examina-

tion of the assault victim was improperly limited.

We affirm the trial court's rulings on issues (2) and (4), and reverse as to issues (1) and (3). Therefore, the judgment is reversed and the case is remanded for a new trial.

I.

At approximately 10:00 p.m. on October 5, 1978, the Tower Bar located at 710 South Broadway in Denver, Colorado was robbed by three black men. Two of the men were armed with shotguns and the third robber carried a revolver. The defendant was identified by Emily Boehler at trial as one of the perpetrators of the armed robbery. The bar is owned by Mrs. Boehler's husband, William Boehler, and his brother. She was working in the establishment at the time of the incident. Mr. and Mrs. Boehler were standing behind the bar when the robbery began. The robbers ordered the patrons and employees to lie on the floor. As Mr. Boehler tried to push the "robbery button," the defendant ordered him to "keep your hands high and come towards me." Mr. Boehler complied with the command and approached the defendant who struck him in the head with the shotgun. Mr. Boehler collapsed to his knees. The defendant ordered Mr. Boehler to lie on the floor. When Mrs. Boehler went to the aid of her husband, the defendant placed his gun in her back and ordered her into the office. The defendant left Mrs. Boehler alone in the office momentarily and she pushed the burglar alarm. The defendant returned and asked Mrs. Boehler "where the money was." She showed him the cash drawer and opened a box which contained money. Mrs. Boehler testified that the defendant "then seemed to get rattled and started throwing things around, looking in everything, turning the boxes of cigarettes we had in the back room, the

1. Section 18–3–202, C.R.S.1973 (1978 Repl.Vol. 8 & 1982 Supp.).

2. Section 18–4–302, C.R.S.1973 (1978 Repl.Vol. 8).

3. Section 18–2–201, C.R.S.1973 (1978 Repl.Vol. 8).

4. Section 16–13–101, C.R.S.1973 (1978 Repl. Vol. 8 & 1982 Supp.).

files, the checks, everything on the floor." As the defendant and Mrs. Boehler were leaving the office, he picked up her husband's coin purse and "jammed" the money into a blue National City Bank money bag. The office cash was wrapped in a band with a teller stamp from National City Bank. The defendant took Mrs. Boehler back into the bar and ordered her to lie down on top of her husband.

The robbers also took the currency from the cash register, football pool money lying next to the register, and a customer's cash which was on the top of the bar. Mr. Boehler later determined that $2,573.97 had been stolen. After the robbery was completed, the defendant left the bar through the front door while his confederates went out the back door.

Officers Dock Foster, III, and Vincent DiManna arrived at the Tower Bar in response to the stick-up alarm. Officer Foster saw a black male walking away from the rear of the bar, wearing a light colored jacket and a ski cap and carrying a shotgun. Officer Foster walked between two buildings to the back of the bar but saw no one. He started running north on Lincoln Street where he saw a pickup truck driven by John Diaz. John Diaz's brother, Daniel Diaz, was a passenger in the pickup. The Diaz brothers stopped when they saw Officer Foster. They told him that they had seen a man running east on Exposition Avenue who was wearing a red stocking cap, a white tunic-type shirt, and black gloves. Officer Foster, who was armed with a shotgun, jumped into the back of the pickup. John Diaz drove east on Exposition Avenue and turned into an alley located just past Sherman Street, where Officer Foster got out of the truck. The Diaz brothers returned to the 700 block of South Sherman Street and stopped when they saw the suspect they had been chasing standing close to a house. The suspect pointed a gun at Daniel Diaz and the Diaz brothers immediately drove away. Daniel Diaz observed the suspect run behind the houses on South Sherman Street. Daniel Diaz saw Officer Foster in the alley, and yelled to him "He's gone to the rear." Officer Foster stationed himself

behind a travel trailer in the alley behind Sherman Street. He heard loud noises in the bushes and saw a man entering the backyard at 718 South Sherman Street. Officer Foster recognized the man as the same person he had seen behind the Tower Bar. As the man approached the gate leading to the alley, Officer Foster pointed his shotgun at the suspect and shouted: "Police. Hold it!" The suspect released his hand from the gate and started to aim his gun at Officer Foster. Officer Foster immediately fired his shotgun and dropped to his knees. Almost simultaneously, the suspect fired his gun at Officer Foster, who then fired two more shots in the direction of the suspect. Foster heard moaning and asked a woman who was looking out her window to call the police. Officers Scott, Gimeno, and Murphy arrived almost immediately. The defendant was identified at trial as the man Officer Foster had shot. The coin purse belonging to Mr. Boehler was taken from the defendant when he was searched. The blue zippered money bag containing cash wrapped in a National City Bank band was also found in the backyard, close to the defendant.

Dr. Peter Murr testified that he treated the defendant in the emergency room at Denver General Hospital. He diagnosed the defendant's injuries as multiple gunshot wounds, including a shotgun wound through the left shoulder, right neck, right shoulder, right forearm, and right posterior abdomen. The trauma to the abdomen appeared to have been caused by a large caliber bullet. The wound to the left shoulder was consistent with the trauma caused by a shotgun blast. In his written history, Dr. Murr indicated there were .38 caliber gunshot wounds to the defendant's right side. Officer Foster denied ever shooting the defendant with his .357 magnum service revolver which contained .38 caliber ammunition.

The defendant was sentenced to a term of twenty-nine to thirty-one years on each offense. The trial court ordered that the sentences run concurrently and that the

defendant be given credit for 676 days of presentence confinement.

## II.

The charges against the defendant were tried to a jury in 1980, before we announced our decision in *People v. Chavez,* 621 P.2d 1362 (Colo.1981), *cert. denied,* 451 U.S. 1028, 101 S.Ct. 3019, 69 L.Ed.2d 398 (1981) (*Chavez I*). At the time of the defendant's trial, the state of the law was such that any admissions of prior felony convictions made by a defendant during the substantive phase of his trial could be used by the People to prove the habitual offender counts. *Hackett v. Tinsley,* 143 Colo. 203, 352 P.2d 799 (1960), *cert. denied,* 364 U.S. 874, 81 S.Ct. 118, 5 L.Ed.2d 96 (1960); *O'Day v. People,* 114 Colo. 373, 166 P.2d 789 (1946); section 16–13–103(1) and (3), C.R.S. 1973 (1978 Repl.Vol. 8).

█ Our decision in *Chavez I* requires reversal of the defendant's convictions. In *Chavez I,* we held that a defendant's right to testify in his own defense on the substantive charges is unconstitutionally burdened where evidence of prior felony convictions is admissible to impeach the defendant when he testifies and his admissions then may be used as substantive proof in the habitual criminality phase of the trial. We stated:

> "The defendant facing habitual criminal charges is forced to choose between his constitutional right to testify in his own defense and his constitutional right to have the State prove the elements of habitual criminality. If he chooses to testify about his past record, the prosecution is relieved of its burden of proving the elements of habitual criminality. The statutory procedure here suffers from the same flaw the United States Supreme Court condemned in *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968): it creates an intolerable tension between two constitutional rights." (Footnote omitted.)

621 P.2d at 1365.

In this case, the trial court properly advised the defendant of his right to testify and explained the effect of his testimony upon the habitual criminal charges. Defense counsel informed the court that the defendant elected not to testify in defense of the substantive charges solely because evidence of his prior felony convictions could be used to prove the habitual criminal charges. The defendant also told the court that he wanted to testify but would not do so because of the negative impact of his testimony on the habitual criminal counts alleged in the information. The defendant had earlier filed motions to dismiss and for a bifurcated trial directed to the habitual criminal counts. Therefore, we conclude that the defendant has properly preserved the issue for appellate review.

The People first invite us to overrule *Chavez I.* We decline to do so. The arguments advanced by the People were considered and rejected by the majority of this court in *Chavez I.*

█ The People next argue that *Chavez I* should not be applied retroactively. The criteria to be used in deciding the question of the retroactivity of new constitutional rules of criminal procedure are: "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." *Stovall v. Denno,* 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967). In *Adams v. Illinois,* 405 U.S. 278, 92 S.Ct. 916, 31 L.Ed.2d 202 (1972), the United States Supreme Court reiterated these factors and made the following observation about a new constitutional rule of criminal procedure that enhances the reliability of the fact-finding process:

> "We have given complete retroactive effect to the new rule, regardless of good-faith reliance by law enforcement authorities or the degree of impact on the administration of justice, where the 'major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious

questions about the accuracy of guilty verdicts in past trials ....' *Williams v. United States,* 401 U.S. 646, 653 [91 S.Ct. 1148, 1152, 28 L.Ed.2d 388] (1971)."

405 U.S. at 280, 92 S.Ct. at 918.

In *People v. Tafoya,* 654 P.2d 1342 (Colo. App.1982), the Colorado Court of Appeals applied the retroactivity rule announced in *Adams v. Illinois, supra,* to the decision in *Chavez I.* The court held:

> "Here ... the truth-finding function of Tafoya's trial was substantially impaired by the trial court's advice to Tafoya because it impermissibly burdened his right to testify and to have the prosecution prove each element of the several counts with which he was charged. *Chavez, supra.* Thus, although the trial court followed applicable Colorado law at the time of the trial, under the circumstances here, Tafoya is entitled to a new trial because *Chavez* applies retroactively."

654 P.2d at 1344. We agree with this analysis. Our decision in *Chavez I* permits a defendant to exercise his constitutional right to testify in defense of the substantive charges, without fear that evidence of his admissions of prior felony convictions will be used against him in the habitual criminality phase of the proceedings. Under the law prior to *Chavez I,* the inability of a defendant to testify in his own defense substantially impairs the truth-finding function because it deprived the jury of relevant evidence, *i.e.,* the defendant's testimony. Therefore, there are serious questions as to the accuracy of guilty verdicts in past trials. A major purpose of our decision in *Chavez I* was to prohibit a procedure in a criminal trial involving habitual criminality which substantially impaired the truth-finding function. *See Ivan v. New York,* 407 U.S. 203, 92 S.Ct. 1951, 32 L.Ed.2d 659 (1972).

■ The fact that the new rule of criminal procedure announced in *Chavez I* increases the reliability of the fact-finding process at trial weighs in favor of granting complete retroactive effect to the decision. However, the extent to which the fact-finding process is enhanced is "necessarily a matter of degree." *Johnson v. New Jersey,* 384 U.S. 719, 729, 86 S.Ct. 1772, 1778, 16 L.Ed.2d 882 (1966). The federal and state constitutions neither prohibit nor require retroactive application of a new constitutional rule. *See United States v. Johnson,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982). Therefore, we must resolve questions of retroactivity in each case by analyzing the specific rule in question. *Tehan v. United States, ex rel. Shott,* 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966); *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). *Chavez I* overruled long-standing precedent. To grant complete retroactive effect to *Chavez I* would have an adverse impact on the administration of justice in this state because of the substantial number of defendants who might seek post-conviction relief, even though their convictions had long been final at the time *Chavez I* was decided. After balancing the factors enumerated in *Stovall v. Denno, supra,* we elect to chart a middle course.

■ We hold that *Chavez I* should be applied retroactively in those cases in which (1) the defendant filed a motion to prohibit the prosecution from using his trial testimony as substantive evidence during the habitual criminal proceedings or otherwise properly preserved the issue in the trial court for appellate review, and (2) the judgment of conviction is not yet final on direct appeal. *People v. Hardin,* 199 Colo. 229, 607 P.2d 1291 (1980). *See United States v. Johnson, supra* [the Court held that the rule promulgated in *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), is applicable to cases pending on direct appeal].

This decision on the retroactivity of *Chavez I* was clearly forecast by our decision in *People v. Chavez,* 632 P.2d 574 (Colo.1981) (*Chavez II*). In that case, the defendant (who is also the defendant in *Chavez I*) was tried on burglary charges arising from an incident which occurred in 1977. *Chavez I* was announced after the defendant was convicted of the burglary charges. In *Chavez II* we stated: "Our decision in *Chavez*

(*I*) mandates that the defendant's convictions of burglary be reversed." 632 P.2d at 578.

## III.

The defendant next alleges that the trial court erred in denying his motion to suppress the in-court identification by Mrs. Boehler, the only witness who identified him as one of the robbers of the Tower Bar. We reject his argument.

During his direct examination of Mrs. Boehler, the district attorney approached the bench and informed the court that he wanted to ask the witness, outside the jury's presence, if she could identify the defendant because he did not know the answer to the question. The trial court granted the request and held an *in camera* hearing. The district attorney asked Mrs. Boehler if she could "identify anyone in the courtroom today." The witness pointed to the defendant and said: "I assume he is the man that is on trial. I don't know. But he was the one that was in the bar that night." She also stated that she was "very sure" of her identification. The trial court then held a suppression hearing.

At the conclusion of the hearing, the trial court made thorough, detailed findings of fact and conclusions of law and denied the motion to suppress Mrs. Boehler's in-court identification of the defendant.

### A.

■ We recognize that under some circumstances an in-court identification may constitute an impermissible one-on-one confrontation which is unnecessarily suggestive and conducive to irreparable mistaken identification. In *Moore v. Illinois*, 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977), the United States Supreme Court stated:

"It is difficult to imagine a more suggestive manner in which to present a suspect to a witness for their critical first confrontation than was employed in this case. The victim, who had seen her assailant for only 10 to 15 seconds, was asked to make her identification after she was told that she was going to view a suspect, after she was told his name and heard it called as he was led before the bench, and after she heard the prosecutor recite the evidence believed to implicate petitioner."

434 U.S. at 229–30, 98 S.Ct. at 465. One-on-one confrontations are viewed with disfavor because they tend to be suggestive and present greater risks of mistaken identification than a line-up. *Moore v. Illinois, supra; Stovall v. Denno, supra; People v. Smith*, 620 P.2d 232 (Colo.1980); *People v. Williams*, 183 Colo. 241, 516 P.2d 114 (1973). However, we have refused to adopt a rule that one-on-one confrontations are per se violations of due process. *People v. Smith, supra; People v. Williams, supra.*

■ The People have the burden of establishing by clear and convincing evidence that in-court identification is not the product of an unduly suggestive confrontation, but is based upon the witness' independent observations of the defendant during the commission of the crime. *Huguley v. People*, 195 Colo. 259, 577 P.2d 746 (1978); *People v. Renfrow*, 193 Colo. 131, 564 P.2d 411 (1977). In considering a claim that the identification procedures used violated due process, the court must decide whether the resulting identification is reliable under the totality of the circumstances surrounding the confrontation. *People v. Smith, supra.*

■ In evaluating the totality of circumstances to determine whether there is an independent basis for the in-court identification, five factors are to be considered: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the time which has elapsed between the crime and the confrontation. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Huguley v. People, supra.* "Against these factors is to be weighed the corrupting effect of the suggestive identification

itself." *Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253.

#### B.

During the *in camera* hearing on the motion to suppress the in-court identification of the defendant by Mrs. Boehler, several facts tending to show the lack of an independent basis for the identification were established. Mrs. Boehler described her opportunity to view the suspect, when he walked behind the bar and struck her husband, as "fleeting." She described the robber to the investigating detective as a black male, 5 ft. 7 in. to 6 ft. in height, weighing 160 to 180 lbs., having a mustache and wearing dark clothing and a ski cap. This description is consistent with a substantial number of black males in the Denver metropolitan area. She did not report that the suspect had a light complexion and freckles, as shown in the photographic line-up (defendant's Exhibit 1). Mrs. Boehler was unable to identify the defendant in a photographic line-up conducted by the police five days after the robbery. Twenty months had elapsed between the date of the crime and the trial. The district attorney told Mrs. Boehler, and she assumed, that the defendant on trial was the shotgun-wielding robber. Other than the judge's clerk, the defendant was the only black male in the courtroom at the time the identification was made.

The trial court weighed these facts together with all the other evidence presented at the hearing in light of the five factors enumerated above. We summarize the findings of the trial court as follows: (1) Mrs. Boehler had an opportunity to observe the defendant at a close range of three feet under fair lighting conditions. (2) The court was impressed with the cool demeanor and "amazing presence of mind" displayed by Mrs. Boehler during the robbery. The court found that her mental state increased her degree of attention and "heightened her motivation and desire to make an identification and recall the individual" who committed the robbery. (3) Her initial description of the defendant was reasonably accurate. (4) The witness stated she was able to make an in-court identification of the defendant because of his face. The court noted that the defendant has a "distinctive appearance." (5) The court expressed concern over the twenty months lapse of time between the crime and the date of the in-court identification and the fact that the witness did not identify the defendant in the photographic line-up. However, the trial judge found that memory functions differently in various persons. Because of the "compelling nature of the incident" and because the witness had reacted with perception and coolness, the court could not find that the lapse of time made her identification unreliable or incredible as a matter of law. The court concluded that there was an independent basis for the in-court identification and that this fact had been proven to its satisfaction by clear and convincing evidence.

Only the trial court was in a position to evaluate the credibility of Mrs. Boehler. Since its findings of fact and conclusions of law are supported by competent evidence in the record, the ruling may not be set aside on appeal. *Young v. People*, 175 Colo. 461, 488 P.2d 567 (1971). All the issues raised by the conflicting evidence and inferences were addressed and resolved by the trial court in its detailed ruling. It is the function of the trial courts, and not the appellate courts, to weigh the evidence and make findings on the pertinent issues. *People v. Kelley*, 172 Colo. 39, 470 P.2d 32 (1970).

Since the trial court found no constitutional violation, the issue of Mrs. Boehler's identification of the defendant was properly submitted by the trial court to the jury for its consideration. The defendant's objections to the in-court identification go to its weight rather than its admissibility. *People v. Thorpe*, 641 P.2d 935 (Colo.1982). The comments of the United States Supreme Court in *Manson v. Brathwaite*, *supra*, are applicable to the identification issue in this case:

"We are content to rely upon the good sense and judgment of American juries, for evidence with some element of un-

trustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature."

432 U.S. at 116, 97 S.Ct. at 2253.

## IV.

Prior to trial, the defendant filed a motion seeking disclosure of the Staff Inspection Bureau (S.I.B.) files of Officers Foster, Scott, and Gimeno. Officer Foster was the victim of the first-degree assault and was the person who shot the defendant. Officers Scott and Gimeno were among the first officers to arrive at 718 South Sherman Street where the shooting occurred.

The trial court held a hearing on the motion and ordered all S.I.B. reports concerning the incident which gave rise to this criminal case to be provided for defense counsel. The court also ordered that all S.I.B. files of the three officers which related to *sustained* complaints of brutality, excessive force, dishonesty, or untruthfulness be produced for an *in camera* inspection. Our understanding of the trial court's use of the word "sustained" is that a complaint was found to be factually supported by the S.I.B. investigation and that some action was taken against the officer by the police department.

After reviewing the files *in camera,* the court found that there were no sustained complaints relating to Officers Foster and Scott. Therefore, no disclosure to defense counsel was ordered.

The trial court found that the S.I.B. files revealed two sustained complaints charging excessive use of force and one sustained complaint involving "untruthfulness" with regard to Officer Gimeno. The trial court denied the request for disclosure of the three sustained complaints. The court reasoned that the information relating to the

three complaints would be rejected at trial pursuant to C.R.E. 403, 404(b), and 608. The defendant has not appealed this ruling.[5]

▮ The defendant contends that the trial court's ruling limiting the defendant's request for discovery of S.I.B. files relating to the three officers to sustained complaints is in error. We agree with his argument.

The trial court adopted the rule and rationale adopted by a division of the Arizona Court of Appeals in *State ex rel. DeConcini v. Superior Court,* 20 Ariz.App. 33, 509 P.2d 1070 (1973). The Arizona court limited discovery of internal police department files to reports which resulted in findings adverse to the officer involved. However, another division of the Arizona Court of Appeals upheld an order entered by the superior court directing production of "all reports or complaints, departmental investigations and actions taken, if any, in connection with similar incidents" pertaining to the officers involved in the incident in question. *State ex rel. Berger v. Superior Court,* 21 Ariz. App. 320, 322, 519 P.2d 73, 75 (1974). These cases are no longer authoritative. In *State v. Superior Court,* 132 Ariz. 374, 645 P.2d 1288 (Ariz.Ct.App.1982), the court explicitly overruled *DeConcini,* holding that no internal affairs records pertaining to over-aggressiveness were properly subject to *in camera* examination and possible disclosure to the defendant in a criminal case. The decision in *State ex rel. Berger v. Superior Court, supra,* was implicitly rejected by the court in *State v. Superior Court, supra.* However, we believe such a ruling is unduly restrictive. Information contained in such complaints, whether sustained or unsustained, could be relevant to the issues in a case.

▮ A defendant who is charged with assaulting a police officer is entitled to dis-

---

**5.** All of the S.I.B. files examined by the trial court were sealed and made part of the record on appeal. It appears that all sustained complaints of any kind were produced for the *in camera* inspection by the court. We have reviewed all of the complaints sustained by departmental action affecting the three officers,

in light of the issues in the case as disclosed by the trial transcript. We agree with the ruling of the trial court that the information contained in the S.I.B. reports is not relevant to any of the material facts in dispute, including credibility of the witnesses.

closure of the fact that complaints charging excessive use of force have been filed against the officer involved. *People v. Zamora,* 28 Cal.3d 88, 615 P.2d 1361, 167 Cal. Rptr. 573 (1980); *Arcelona v. Municipal Court,* 113 Cal.App.3d 523, 169 Cal.Rptr. 877 (1980); *Nakagawa v. Heen,* 58 Hawaii 316, 568 P.2d 508 (1977); *State v. Pohl,* 89 N.M. 523, 554 P.2d 984 (1976). In *Martinelli v. District Court,* 199 Colo. 163, 612 P.2d 1083 (1980), we held that S.I.B. reports could contain evidence probative of the officer's propensity toward misconduct. We approved the procedure of producing such files for an *in camera* inspection by the trial court. We did not draw a distinction between sustained and unsustained complaints.

In *Denver Policemen's Protective Ass'n. v. Lichtenstein,* 660 F.2d 432 (10th Cir.1981), the federal court of appeals upheld a discovery order directing production of S.I.B. reports to a defendant who was charged with assaulting a police officer. The court found that the police officer's expectation of privacy may be overridden by the state's compelling interest in the determination of the truth and safeguarding the defendant's right to exculpatory evidence. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). "[W]hen the only prosecution witnesses are the police officers involved, anything that goes to their credibility may be exculpatory." *Denver Policemen's Protective Ass'n. v. Lichtenstein,* 660 F.2d at 436.

The procedure employed by the trial court of ordering the S.I.B. files to be produced for an *in camera* inspection and applying a balancing test to determine what documents should be given to defense counsel protects the competing interests of the defendant, the government, and the public.

Since this case is being remanded for a new trial, the trial court shall conduct an *in camera* examination of all complaints of brutality, excessive use of force, dishonesty or untruthfulness which relate to the three police officer witnesses and determine what, if any, information contained in the S.I.B. files should be disclosed to defense counsel in accordance with the standards announced in *Martinelli v. District Court, supra.*

## V.

The defendant's final claim of error is that the trial court abused its discretion in limiting the cross-examination of Officer Foster concerning the investigation of the shooting incident by the Denver Police Department. The trial court precluded defense counsel from establishing that an investigation of the shooting was conducted by the police department. The court concluded that the probative value of the evidence relating to the existence of the investigation and its results was outweighed by confusion of the issues and prejudice to the People. C.R.E. 403.

The court permitted defense counsel to establish during the cross-examination of Officer Foster the following facts: (1) When there is a shooting involving a police officer, an investigation is undertaken by the Homicide Bureau of the Denver Police Department. (2) It is the policy of the department to conduct such an investigation. (3) The investigation may result in the imposition of sanctions, including the filing of criminal charges, suspension, reprimand, or other action adverse to the officer. (4) Officer Foster had given a formal statement to an investigator from the Denver Police Department during the late hours of October 5, 1978, and the officer was represented by an attorney when he provided the statement.

Cross-examination by questions which focus on the motive of a witness is liberally permitted. *People v. Taylor,* 190 Colo. 210, 545 P.2d 703 (1976). The scope of the cross-examination permitted enabled defense counsel to explore the officer's self-interest, motive, and bias as factors which affected his credibility. The ruling of the trial court properly prevented the sideshow from taking over the circus. *See People v. Taylor,* 190 Colo. at 213, 545 P.2d 703. The scope and limits of cross-examination for impeachment and general credibility are within the discretion of the trial court and

will not be disturbed absent an abuse of that discretion. *People v. Crawford,* 191 Colo. 504, 553 P.2d 827 (1976); *People v. Cushon,* 189 Colo. 230, 539 P.2d 1246 (1975); *People v. Evans,* 630 P.2d 94 (Colo.App. 1981). The trial court did not abuse its discretion in this case.

### VI.

The judgment is reversed. This case is remanded to the trial court for a new trial and for further proceedings consistent with this opinion.[6]

---

**6.** Since the convictions on the substantive counts have been vacated, the pleas of guilty to the habitual criminal counts are invalid and must likewise be vacated. However, there is no impediment to the reinstatement of the five counts of habitual criminality dismissed as a result of the plea bargain. *People v. Keenan,* 185 Colo. 317, 524 P.2d 604 (1974); *People v. Mason,* 176 Colo. 544, 491 P.2d 1383 (1971); *People v. Ivery,* 44 Colo.App. 511, 615 P.2d 80 (1980).