21CA1942 Peo v Gallegos-Valdez 07-10-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 21CA1942
Weld County District Court No. 19CR2084
Honorable Thomas J. Quammen, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Ivan Jose Gallegos-Valdez,

Defendant-Appellant.

---

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division VI
Opinion by JUDGE WELLING
Kuhn and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 10, 2025

---

Philip J. Weiser, Attorney General, Brock J. Swanson, First Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Andrea R. Gammell, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Ivan Jose Gallegos-Valdez appeals his convictions for aggravated robbery, felony menacing, and aggravated motor vehicle theft. Because we agree with Gallegos-Valdez's contention that the trial court erred by allowing the victim's two identifications of him to be admitted as evidence at trial, we reverse the convictions and remand for a new trial.

## I.    Background

¶ 2    K.B. left his shift as a pizza delivery driver and walked to his car. Just after he sat down and closed his car door, a man opened the driver's side door from the outside and told K.B. to leave the keys in the ignition and move to the passenger seat. K.B. never saw a weapon on the man but noticed him reach toward his hip, which he took as a sign that the man was armed. K.B. got into the passenger seat and promptly exited through the passenger door. The man then sped away in K.B.'s car.

¶ 3    K.B. ran back to his employer and called 911 to report that his car had been stolen. K.B. told the dispatcher that the man who stole his car was "a Mexican guy" in his mid-twenties or early thirties with "a little goatee" and wearing a white shirt and "regular

jeans." Sergeant Matthew Rundle responded to the scene shortly thereafter.

¶ 4    Sergeant Rundle obtained a limited description of the perpetrator — mostly of his clothes — from K.B. at the scene and began searching for surveillance cameras at nearby businesses. Based on K.B.'s description, Sergeant Rundle obtained footage of a man inside a nearby liquor store around the time of the vehicle theft. Sergeant Rundle presented K.B. with a screenshot of the liquor store surveillance footage. He told K.B., "[W]e saw the crime happen, and the individual, before the crime happened, went into the liquor store." Then Sergeant Rundle asked K.B., "Is this the guy that stole your vehicle?" K.B. got excited and said, "That's him. That's him. That's him."

¶ 5    The next day, after determining that the man from the screenshot was Gallegos-Valdez, Sergeant Rundle asked K.B. to come to the police station to participate in a photo array identification. When Sergeant Rundle showed K.B. the array of six photos, K.B. immediately identified the photograph of Gallegos-Valdez as the person who had stolen his car.

¶ 6     Gallegos-Valdez was arrested and charged with three felonies — robbery, theft, and menacing.  Prior to trial, Gallegos-Valdez moved to suppress the initial show-up identification as unduly suggestive and all the subsequent identifications as tainted by the initial one.  The trial court held a hearing that spanned three days during which Seargent Rundle testified about his investigation that led to K.B.'s two identifications of Gallegos-Valdez.  K.B. didn't testify at the suppression hearing.  While the court found that the show-up identification was suggestive, it concluded that K.B.'s identification was sufficiently reliable to admit as evidence.

¶ 7     At trial, K.B. testified that the man who stole his car wore a white t-shirt, a grey backward flat-billed hat, and "jean-like clothing," and had a goatee.  K.B. also testified that the perpetrator was Mexican and didn't have any face tattoos.  The jury found Gallegos-Valdez guilty of aggravated robbery, felony menacing, and aggravated motor vehicle theft.

## II.    Discussion

### A.    Issues on Appeal

¶ 8     Gallegos-Valdez advances four contentions on appeal. Specifically, he contends that the trial court erred when it (1) denied

his motion to suppress K.B.'s identification of him; (2) allowed an officer to testify about video evidence not admitted at trial; (3) allowed expert testimony under the guise of lay testimony; and (4) expanded the deadly weapon element of robbery and menacing. Gallegos-Valdez also argues that the cumulative effect of these errors deprived him of his right to a fair trial. Because we agree that the court erred by admitting K.B.'s identification of Gallegos-Valdez, and because this error requires reversal, we don't address his other arguments, which are unlikely to arise in the same posture on remand.

## B.     The Identification

¶ 9     Gallegos-Valdez contends that the trial court improperly declined to suppress evidence of the show-up identification because the procedures used were impermissibly suggestive and the following identifications were unreliable under the totality of the circumstances. We agree with the trial court's conclusion that the show-up identification procedure was suggestive. But the evidence doesn't support the trial court's conclusion that K.B.'s identifications were nonetheless reliable and therefore admissible.

### 1. Applicable Law and Standard of Review

¶ 10   A court analyzes a claim that an identification procedure was unduly suggestive in two parts. First, the court must determine if the identification procedure was impermissibly suggestive. *People v. Williams*, 2019 COA 32, ¶ 8. Then, the court has to determine if the subsequent identification is reliable. *Id.* at ¶ 10.

¶ 11   Initially, the defendant has the burden of proving that an identification procedure used by the State was "impermissibly suggestive." *Bernal v. People*, 44 P.3d 184, 191 (Colo. 2002). An impermissibly suggestive procedure may "give rise to a very substantial likelihood of irreparable misidentification." *People v. Jaquez*, 2018 COA 76, ¶ 49. A one-on-one identification — also referred to as a "show-up" identification — occurs when the eyewitness is asked to identify a single person who appears in-person or through a video or photograph. Such procedures are disfavored and "tend to be suggestive" because they are more likely to lead to a mistaken identification than a lineup. *People v. Walker*, 666 P.2d 113, 119 (Colo. 1983); *People v. McCants*, 2021 COA 138, ¶ 19.

5

¶ 12     An eyewitness may also be asked to identify a suspect through the presentation of an array of photos depicting people with similar characteristics.  There are several factors that a court should consider when determining if a photo array identification procedure is unduly suggestive, including (1) the size of the array; (2) the manner of its presentation; and (3) the details of the photographs.  *Williams*, ¶ 9.  A procedure that only includes one photo that matches the description of the perpetrator can be impermissibly suggestive.  *Id.*

¶ 13     If the defendant carries their burden to show that the identification procedures were unduly suggestive, then the prosecution has the burden of proving by clear and convincing evidence that subsequent identifications of the defendant weren't the result of an unduly suggestive procedures, but instead were based on the witness's "independent observations of the defendant during the commission of the crime."  *Walker*, 666 P.2d at 119.

¶ 14     The trial court must determine whether the identification "is reliable under the totality of the circumstances."  *Id.*  When assessing the totality of the circumstances of a show-up identification, a court considers

(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

*Bernal*, 44 P.3d at 192; *see also People v. Mascarenas*, 666 P.2d 101, 109 (Colo. 1983); *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). Once the court has considered whether the subsequent identifications were tainted by the suggestive procedure, if "the totality of the circumstances does not suggest a very substantial likelihood of misidentification, identification testimony will be admissible." *People v. Borghesi*, 66 P.3d 93, 104 (Colo. 2003).

¶ 15  "The ultimate question as to the constitutionality of pretrial identification procedures is a mixed question of law and fact." *Bernal*, 44 P.3d at 190. We defer to the trial court on findings of fact if they're supported by the record but review the trial court's legal conclusions de novo. *McCants*, ¶ 20. While a trial court's findings of fact are entitled to deference, we may "give different weight to those facts and may reach a different conclusion." *Bernal*, 44 P.3d at 190.

7

¶ 16 "A defendant is denied due process when an in-court identification is based upon an out-of-court identification which is so suggestive as to render the in-court identification unreliable." *Borghesi*, 66 P.3d at 103.

¶ 17 Gallegos-Valdez preserved his contentions regarding the inadmissibility of the identifications, and because Gallegos-Valdez's due process rights are implicated, we review for constitutional harmless error. *Hagos v. People*, 2012 CO 63, ¶ 11. Applying that standard, we reverse unless there is no reasonable doubt that the error might have contributed to the conviction. *Zoll v. People*, 2018 CO 70, ¶ 18; *see also Hagos*, ¶ 11.

### 2. Additional Facts

¶ 18 As noted above, after Gallegos-Valdez moved to suppress both of K.B.'s identifications, the trial court held a suppression hearing that spanned three relatively brief days.

¶ 19 The first day of the hearing just consisted of Sergeant Rundle's testimony. He testified about the circumstances of the crime:

> Okay. So [K.B.] made it to his vehicle. Before he made it to his vehicle, he noticed a male and a female sitting at the bench at the rear of the establishment. Didn't pay much attention to them. Walked to his vehicle, got into his

8

vehicle, was attempting to shut the door, got the door shut, and as soon as the door latched it was reopened immediately. A male then told him to get to the passenger's side of the vehicle and leave the keys in the ignition. At that time [K.B.] jumped to the passenger's side of the vehicle. He stated that he was in fear of his life because the individual had his hands in his pockets and — portraying that the suspect had some type of weapon on him, that he was in fear for his life, so he jumped to the passenger's side of the vehicle, ended up jumping out of the vehicle, scratching his — I do believe it was right knee on the floor, banging it on the floor. At that time the vehicle sped off at a high rate of speed out of the parking lot.

¶ 20    After Sergeant Rundle arrived on the scene, K.B. gave him a

limited description of the car thief:

[Defense counsel:] . . . [K.B.] described the person he saw in his vehicle?

[Sergeant Rundle:] He actually described what he was wearing, so his description —

Q. So the clothing?

A. Correct.

Q. [K.B.] didn't tell you that [the perpetrator] had a goatee on his face?

A. I — it's unknown at this time. I — I don't remember if he told me he had facial hair or not.

Q. Or a thin mustache?

A. He might have.

Q. Okay. You don't remember that he said that it was a Mexican guy?

A. I — I don't believe he mentioned a race.

Q. Were you able to hear the 911 call that he made —

A. No.

Q. — prior to this hearing?

A. No.

¶ 21    Moments later, Sergeant Rundle was unable to remember exactly how K.B. described the car thief again:

> [Sergeant Rundle:] I don't remember the conversation that we had between him [sic]. At the time [K.B.] had stated that — what the individual was wearing, and that's the individual that I observed inside the liquor store.
>
> [Prosecutor:] And those clothes — you can — you can tell what the person is wearing based on the liquor store surveillance of the interior of the liquor store?
>
> A. Absolutely.

¶ 22    On the day of the incident, Sergeant Rundle found a video of the crime from the outside of a nearby business, and another video of a man who he thought matched K.B.'s description in a nearby

liquor store shortly before the crime occurred. Through these contacts, Sergeant Rundle identified the man in the liquor store video as Gallegos-Valdez.

¶ 23　　Sergeant Rundle next testified about the initial one-picture showup that he presented to K.B.:

> [Prosecutor:] And [K.B.] gave — it sounded like you were describing a vague description of the person?
>
> [Sergeant Rundle:] Mostly what the individual was wearing, but, yes.
>
> Q. And did [K.B.] give any indication as to race or facial hair or anything like that to your recollection?
>
> A. I don't remember. I don't remember if he did or not.
>
> Q. So then you start pulling video, and it sounds like several hours —
>
> A. Correct.
>
> Q. — pulling video, looking for someone around, and you get this still shot from the liquor store's video?
>
> A. Correct.
>
> Q. And that picture you actually show [K.B.] at about that time?
>
> A. Correct.

11

Q. And what did that conversation sound like?

A. I said, "Hey, we just watched — what you're describing happened, we watched it on the video surveillance from the liquor store, and that individual was actually inside the liquor store." I then showed him a still picture of that video . . . . I then had told him that we saw the crime happen and the individual, before the crime happened, went into the liquor store, from what I believed. And at that time I showed the victim the picture, and I said, "Is this the guy that stole your vehicle," and he got excited and said, "That's him. That's him. That's him."

Q. Did he say anything else at that time?

A. Not — not that — not to my knowledge. Just — it was very positive that that was him.

Q. Did he say anything — any indication he had any doubts about that?

A. No. No doubts whatsoever.

¶ 24     The day after the show-up identification, K.B. and his father met Sergeant Rundle at the Eaton Police Department. Sergeant Rundle presented K.B. with a six-photo lineup that included photographs of Gallegos-Valdez and five other similar-looking men. K.B. "instantaneously" identified Gallegos-Valdez as the man who stole his car.

¶ 25    The car was found in Greeley the day after it was stolen. When it was found, the vehicle contained items that didn't belong to K.B., including a love letter signed by a woman named Olivia to a man she called "My Droopy." Sergeant Rundle called Gallegos-Valdez's parole officer — Officer Abriana Fernandez — and asked if she knew of any connections Gallegos-Valdez might have with a woman named Olivia. Officer Fernandez said that she believed Gallegos-Valdez had a girlfriend or a cousin named Olivia. No evidence was offered at the hearing about the identity of "My Droopy."

¶ 26    Following the hearing, the trial court found that the initial show-up identification was unduly suggestive because Sergeant Rundle had identified the person in the picture as the perpetrator before asking K.B. if that was true. So the trial court considered the five *Bernal* factors, finding that each of them supported the conclusion that K.B.'s identifications were reliable.

¶ 27    Last, the trial court found that Olivia's letter found in the car was "part of the totality of the circumstances as well" since Sergeant Rundle testified that Gallegos-Valdez's parole officer had told him that Olivia was Gallegos-Valdez's cousin or girlfriend.

Based on all of these findings, the trial court concluded that K.B.'s identification of Gallegos-Valdez was reliable.

### 3.    Analysis

¶ 28    Gallegos-Valdez contends that the trial court erred by denying his motion to suppress both of K.B.'s identifications of him.  We agree for three reasons.

### a.    The Prosecution Didn't Meet Its Burden

¶ 29    First, the prosecution didn't offer adequate evidence at the suppression hearing to meet its burden.

¶ 30    Consider Sergeant Rundle's testimony — he couldn't remember *any* identifying information that K.B. communicated to him before identifying Gallegos-Valdez as the person who stole his car.  Sergeant Rundle only testified that K.B. had given him a description of the perpetrator's clothing — "At the time [K.B.] had stated that — what the individual was wearing, and that's the individual that I observed inside the liquor store."  This testimony doesn't contain any objective information that would tend to support the reliability of K.B.'s identification.  Instead, Sergeant Rundle's testimony was conclusory — that K.B.'s identification was reliable because his description of the perpetrator matched

14

Gallegos-Valdez. But that was for the court to decide based on specific facts.

¶ 31 For example, Sergeant Rundle didn't testify what color K.B. said the perpetrator's clothes were, how tall or old he was, his approximate weight, what his facial hair looked like, or his skin, hair, or eye color.[1] He only testified that K.B.'s description of Gallegos-Valdez's clothes was consistent with what Gallegos-Valdez was wearing in the video from the liquor store.[2]

¶ 32 To be sure, the prosecution presented relevant evidence — that the show-up identification occurred between one to two hours after the crime, that K.B. was "very positive" that Gallegos-Valdez was the perpetrator during the showup, and that K.B. had the

---

[1] The procedure of the six-photo lineup was captured on Sergeant Rundle's body camera, and the video recording of that procedure was admitted as an exhibit at the suppression hearing. During that procedure, K.B. did indicate that the person who stole his car had facial hair. But that video — and the details that K.B. provided when making the identification from the photo array — didn't have any bearing or shed any light on what details K.B. provided to Sergeant Rundle before being shown the still photograph from the liquor store video.

[2] Even this testimony is inconclusive, since the color of Gallegos-Valdez's clothing is grey and black in the video, but bright white in the picture. Without knowing how K.B. specifically described the perpetrator, it is impossible to determine if his description was accurate.

15

opportunity to see the perpetrator during the crime. But without more detail about K.B.'s initial description of the perpetrator, it isn't possible to determine whether K.B.'s show-up identification was reliable.

### b. The Trial Court's Findings Are Not Supported

¶ 33 Second, while the trial court made specific findings regarding the reliability of K.B.'s identifications, most of those findings aren't supported by competent evidence in the record.

### i. Opportunity of the Witness to View the Perpetrator at the Time of the Crime

¶ 34 The trial court found that the first *Bernal* factor supported K.B.'s identification of Gallegos-Valdez:

> Factors to be considered include the opportunity of the witness to view the — the criminal at the time of the crime. This was not a passive contact. This wasn't contact that a person had of another contact that was unremarkable at the time of the — of the observation. This was a person who was trying to take the victim's car and succeeded in that and the victim was in the car itself when the perpetrator entered the vehicle, told him to slide over and was suggesting that he had and was then armed.
>
> . . . So, this was a remarkable event. And so, the Court finds that [K.B.] had the opportunity to witness and had a good view of the witness

> [sic].  Even though it may not have been hours, it doesn't take long to make an identification of something that is happening that is significant in your life.

¶ 35    But this finding is unsupported by the record.  It was a reasonable inference from the circumstances this was a "remarkable event" in K.B.'s life.  But because K.B. didn't testify at the suppression hearing, there was no basis for the court to conclude that K.B. "had the opportunity to witness and had a good view" of the perpetrator.  And because Sergeant Rundle didn't (or couldn't) testify to the identifying details K.B. provided to him, there wasn't even circumstantial evidence that K.B. had a good opportunity to view the perpetrator.

### ii.    The Witness's Degree of Attention

¶ 36    The trial court found that K.B. was focused on the perpetrator during the car theft:

> Two, [t]he witness' degree of attention.  Well, his attention was the armed person that was stealing his car.  That was the focus of his attention.

¶ 37    But the court's findings aren't supported by the record.  Again, K.B. didn't testify at the suppression hearing, so the court didn't have any grounds for concluding that K.B.'s attention "was on the

17

person stealing his car." In addition, the total encounter between the man and K.B. lasted approximately twenty seconds, and for portions of that time K.B. was focused on what he thought may be a gun, moving from the driver's seat to the passenger seat, and exiting out the passenger door. Thus, the time period for K.B. to actually focus on the man's identifying features was limited. Moreover, the absence of any corroborating evidence from Sergeant Rundle's testimony means that the court's findings are, at best, speculative.

### iii. The Accuracy of the Witness's Prior Description

¶ 38 The trial court found that Sergeant Rundle's testimony was sufficient to satisfy the third *Bernal* factor:

> Three. The accuracy of the witness' prior description of the criminal. The clothing that he described was a match in the view of the — as testified by the Sergeant. It was a match and although the Sergeant was not able to describe the — the physical features of the face, he did get a description of that from the Defendant — I mean from the victim. And it was accurate with the photograph that was taken.

¶ 39 But Sergeant Rundle didn't testify that K.B. described the perpetrator's face. Instead, Sergeant Rundle testified that he wasn't

18

sure whether K.B. described anything about the perpetrator other than his clothing. So this portion of the trial court's findings are contradicted by the record.

¶ 40 Moreover, Sergeant Rundle's testimony at the suppression hearing didn't include any of the details that K.B. provided of the perpetrator's clothing. Instead, Sergeant Rundle merely concluded that the description he received from K.B. matched the clothing Gallegos-Valdez was wearing in the liquor store. Because Sergeant Rundle's testimony lacked any detail, the court, as the fact finder, couldn't independently assess whether K.B.'s description of the man's identifying features matched Gallegos-Valdez. That's problematic. *Cf. People v. Daley*, 2021 COA 85, ¶¶ 91-94 (observing that a detective's testimony that a witness's earlier statements were consistent with later statements, without any details about the two statements, usurps the fact finder's function).

iv. The Level of Certainty Demonstrated by the Witness at the Confrontation

¶ 41 The trial court noted K.B.'s confidence during the showup:

> [Four:] The level of certainty demonstrated by the witness at the confrontation. Well, as I said, according to the testimony that was given, is this the guy that stole your vehicle?

19

[K.B.] got excited, so his demeanor is corroborating what he's about to say. He got excited and said, that's him, that's him, that's him. He was very positive that was him. So, the degree of certainty was high.

¶ 42    The court's findings regarding the fourth *Bernal* factor are indeed supported by the record, specifically Sergeant Rundle's testimony regarding his observations of K.B. during the identifications.

v.    The Length of Time Between the Crime and the Confrontation

¶ 43    Lastly, the trial court recounted Sergeant Rundle's testimony about the timing of the showup:

[Five:] The length of time between the crime and the confrontation; this was just a matter of a couple of hours.

¶ 44    Because the court's findings here are also derived from, and supported by, Sergeant Rundle's testimony, they are supported by the record.

vi.    Weighing the Factors

¶ 45    Because the court's findings on the first three *Bernal* factors were unsupported by the record, they must be excluded. Our task is to determine whether the remaining two factors offer adequate support for the trial court's conclusion that K.B.'s identification of

20

Gallegos-Valdez was reliable. The trial court's explanation for why it determined that the show-up procedure was impermissibly suggestive is relevant to our analysis:

> Well, as far as the first step of the analysis, the Court finds that this was suggestive. I mean it's — the Officer is basically telling the victim, we saw the crime occur, we saw that the person who committed this crime was in the liquor store just before this. Now, is this a picture of him? Well, that is suggestive. He didn't just — show him the photograph and — and asked if this was or was not him and so, the Court finds that that was suggestive and that the Defense has met their burden on Step [one] . . . .

¶ 46 The trial court emphasized that the showup was impermissibly suggestive in large part due to Sergeant Rundle's decision to tell K.B. that the person in the liquor store surveillance photo was the same person who committed the crime. We agree with the trial court's logic.

¶ 47 But that logic requires reversal. Because Sergeant Rundle identified Gallegos-Valdez as the perpetrator before asking K.B. if he recognized him, the fourth factor — K.B.'s level of certainty — could just as easily be attributed to Sergeant Rundle's statements at the

21

suggestive showup as to K.B.'s independent observation. As a result, that factor isn't dispositive on its own.

¶ 48 And the fifth factor doesn't help either, since Sergeant Rundle's statements could have invited K.B.'s enthusiastic response regardless of the amount of time that had elapsed.

¶ 49 Under these circumstances, the first three factors are more objective, and at the very least could have provided circumstantial evidence supporting K.B.'s identification. For example, if the trial court had adequate details about how K.B. described the perpetrator to Sergeant Rundle, then the trial court would have had an objective measure of how accurate K.B.'s show-up identification was. But the court's findings regarding the first three factors had *no record support.*[3]

---

[3] The trial court also said that the letter from Olivia found in the car supported its conclusion that K.B.'s identification was reliable. But supporting evidence isn't necessarily corroborating evidence. Moreover, the trial court didn't tie the relevance of the letter to a particular *Bernal* factor. And even if the *Bernal* factors aren't exclusive, we fail to see, and the trial court didn't explain, how the love letter from Olivia makes K.B.'s identification more reliable.

¶ 50    Therefore, because the excluded factors are decisive in determining whether K.B.'s identification was reliable, the court's conclusion was error.

### c.    The Error Wasn't Harmless

¶ 51    The third and final reason the erroneous admission of the identifications warrants reversal is that the error was not harmless. Identification of the accused is a necessary element to prove any crime. *People v. Watkins*, 553 P.2d 819, 821 (Colo. 1976) ("Of course, the identity of the defendant as the perpetrator of the crime charged is an element of the crime which must be proven beyond a reasonable doubt."). Because K.B. made the only identifications of Gallegos-Valdez, and those identifications are unreliable, the trial court's error cannot be harmless. Accordingly, we reverse Gallegos-Valdez's convictions and remand the case to the trial court for a new trial. However, the issue of whether K.B.'s identifications of Gallegos-Valdez are admissible may not be re-litigated on remand. *People v. Null*, 233 P.3d 670, 681 (Colo. 2010) (denying the prosecution "a second bite at the apple" when the prosecution failed to meet its evidentiary burden at a suppression hearing (quoting *Burks v. United States*, 437 U.S. 1, 17 (1978))).

¶ 52    Because we reverse Gallegos-Valdez's convictions on the issue of identification, we do not address his other contentions.

### III.    Disposition

¶ 53    The judgment is reversed, and the case is remanded with directions.

JUDGE KUHN and JUDGE SCHUTZ concur.