The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
November 23, 2022

## 2022COA135

**No. 20CA1121, *People v. Cline* — Crimes — Second Degree Assault of a Police Officer; Criminal Procedure — Subpoena — In Camera Review; Criminal Law — Jury Instructions — Use of Deadly Physical Force Against an Intruder — Unlawful Entry**

In this direct criminal appeal, a division of the court of appeals clarifies that a defendant who has been charged with assaulting a police officer must make the showing required by *People v. Spykstra*, 234 P.3d 662, 666 (Colo. 2010), when requesting an in camera review of the police officer's subpoenaed personnel files. Because the defendant failed to make the requisite showing, the division concludes that the district court need not have conducted an in camera review before quashing a subpoena for the file.

The division also declines to follow another division's interpretation of the term "unlawful entry" in the context of the

force-against-intruders statute, § 18-1-704.5(2), C.R.S. 2022.  *See People v. Zukowski*, 260 P.3d 339, 344 (Colo. App. 2010).  Instead, the division defers to the Colorado Supreme Court's definition as set forth in *People v. McNeese*, 892 P.2d 304, 311-12 (Colo. 1995).  Because no credible evidence supported an unlawful entry under the *McNeese* definition, the division rejects the defendant's contention that a force-against-intruders instruction should have been given to the jury.

The division also rejects the defendant's remaining contentions that the district court erroneously instructed the jury in other ways and erred by limiting the defendant's expert witness' testimony.  Accordingly, the division affirms the defendant's convictions.

COLORADO COURT OF APPEALS    **2022COA135**

Court of Appeals No. 20CA1121
La Plata County District Court No. 19CR91
Honorable William L. Herringer, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

William Benjamin Cline VI,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE BROWN
J. Jones and Kuhn, JJ., concur

Announced November 23, 2022

Philip J. Weiser, Attorney General, Christine Brady, Senior Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

The Law Office of Haddon, Morgan & Foreman, P.C., Adam Mueller, Denver,
Colorado, for Defendant-Appellant

¶ 1     Defendant, William Benjamin Cline VI, appeals the judgment of conviction entered on jury verdicts finding him guilty of first degree criminal trespass, second degree assault of a peace officer, third degree assault, harassment, and criminal mischief.  Cline contends that the district court erred by (1) refusing to conduct an in camera review of a police officer's personnel file; (2) erroneously instructing the jury on his defenses; and (3) precluding him from presenting certain expert testimony.

¶ 2     Resolving Cline's first contention requires us to clarify that a defendant who has been charged with assaulting a police officer must make the showing required by *People v. Spykstra*, 234 P.3d 662, 666 (Colo. 2010), to be entitled to an in camera review of the officer's subpoenaed personnel file.  Because Cline failed to make the required showing, we affirm the district court's order quashing his subpoena without conducting an in camera review.

¶ 3     In resolving Cline's second contention, we decline to follow *People v. Zukowski*, 260 P.3d 339, 344 (Colo. App. 2010), a decision from a division of this court interpreting the term "unlawful entry" for purposes of the force-against-intruders statute, § 18-1-704.5(2),

C.R.S. 2022.[1]  Instead, we defer to the Colorado Supreme Court's definition as set forth in *People v. McNeese*, 892 P.2d 304, 311-12 (Colo. 1995).  Because no credible evidence showed an unlawful entry under the *McNeese* definition, we conclude that the district court did not err by refusing Cline's force-against-intruders instruction.

¶ 4     And because we reject the balance of Cline's contentions, we affirm his judgment of conviction.

## I.     Background

¶ 5     The evidence presented at trial, including body camera footage, would have allowed the jury to find the following facts.  On February 13, 2019, Cline crashed a golf cart into a snowbank near his neighbor W.P.'s house.  Cline entered W.P.'s house through an unlocked garage door and woke W.P. up by flashing a light into his bedroom.  W.P. got out of bed and saw Cline inside his kitchen and then again outside his garage.  W.P. first called the neighborhood's security gate guard and then called 911.  The gate guard informed

---

[1] The force-against-intruders statute is nicknamed the "Make My Day Law" and is referred to as such by the parties.  Following *People v. Rau*, 2022 CO 3, ¶¶ 1-2, we refer to it as the "force-against-intruders" statute.

the responding officers, Deputy Draughon and Deputy Christensen, that the golf cart belonged to the Cline family.

¶ 6    Once the deputies arrived at Cline's home, they knocked on the front door, identified themselves as sheriff's deputies, and told Cline to open the door and step out to talk with them.  Cline instead invited the deputies inside and offered them a drink.

¶ 7    Once inside, Deputy Draughon faced Cline and began reading him his *Miranda* rights while Deputy Christensen moved to Cline's left.  Cline took issue with Deputy Christensen's position and gestured toward Deputy Christensen while telling him to move back.  The deputies handcuffed Cline and sat him on the floor.  After Cline was handcuffed, he would not stand and struggled with the deputies.  At one point, all three men tumbled to the floor.

¶ 8    Once Cline seemed to calm down, Deputy Christensen went outside to move the patrol vehicle closer to Cline's front door while Deputy Draughon held Cline prone on the floor.  When Deputy Draughon took his hand off Cline and reached for his radio, Cline flipped over onto his back and kicked Deputy Draughon.  The two physically struggled.  Deputy Draughon punched Cline, wrapped his legs around Cline, and put Cline in a chokehold.  Cline pulled

Deputy Draughon's genitals during this struggle. Deputy Christensen returned during the episode and tased Cline, subduing him. Eventually, after other officers arrived, the deputies stood Cline up and escorted him to the patrol vehicle.

¶ 9 Deputy Draughon transported Cline to jail. During the drive, Cline shouted at the deputy and called him racist names. Cline also kicked the door of the police vehicle, causing damage.

¶ 10 Cline was charged with second degree burglary, first degree criminal trespass, second degree assault of a peace officer, third degree assault, harassment, and criminal mischief.[2] The district court bifurcated Cline's charges for trial.

¶ 11 The court first held a jury trial on the charges of burglary and criminal trespass (the burglary trial). Cline's theory of defense was that he lacked the requisite mens rea to carry out a burglary or trespass. A jury convicted Cline of first degree trespass and acquitted him of second degree burglary.

---

[2] Cline was also charged with resisting arrest, prohibited use of a weapon, and driving under the influence, but the People dismissed those charges.

4

¶ 12     The court later held a jury trial on the charges of second degree assault of a peace officer, third degree assault, harassment, and criminal mischief (the assault trial). Cline's theory of defense was that his actions were justified under the force-against-intruders statute and as self-defense. A jury convicted Cline of all four charged crimes.

## II.     In Camera Review of Personnel File

¶ 13     Cline contends that the district court erred by not conducting an in camera review of Deputy Draughon's personnel file before granting the La Plata County Sheriff's motion to quash a subpoena requesting the file. We perceive no error.

### A.     Standard of Review and Generally Applicable Law

¶ 14     We review a district court's decision to quash a subpoena for an abuse of discretion. *People v. Battigalli-Ansell*, 2021 COA 52M, ¶ 69 (citing *Spykstra*, 234 P.3d at 666). A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or if it misconstrues or misapplies the law. *People v. Liggett*, 2021 COA 51, ¶ 16.

¶ 15     Crim. P. 17(c) generally authorizes the prosecution or the defense to subpoena documentary evidence to be produced at a

hearing or trial. But "[t]he rule does not create an equivalent to the broad right of civil litigants to discovery of all information that is relevant or may lead to the discovery of relevant information." *Spykstra*, 234 P.3d at 669. Thus, the court, on motion, "may quash or modify [a] subpoena if compliance would be unreasonable or oppressive." Crim. P. 17(c).

## B. Additional Background

¶ 16 Before trial, Cline served a subpoena duces tecum on the La Plata County Sheriff seeking, among other things, the personnel file of Deputy Draughon. The Sheriff filed a motion to quash the request for the personnel file because it was "unreasonable" and sought confidential documents and information.

¶ 17 During a hearing on the motion to quash, Cline's counsel acknowledged this was "a *Spykstra* issue" and that Cline would not be entitled to the entire personnel file. Instead, defense counsel argued that Cline was entitled to "things like credibility, aggression, use of [t]aser, [and] use of force" documented in the personnel file. Defense counsel asked the Sheriff to submit the records to the district court for in camera review after which the parties could "fine tune" their arguments about what should be produced. The

attorney for the Sheriff argued that Cline had failed to make the necessary showing to trigger an in camera review.

¶ 18    The court received the records and took the matter under advisement.  In a brief written order, the court quashed the subpoena as to the personnel file of Deputy Draughon because Cline "failed to show a specific factual basis demonstrating [a] reasonable likelihood that documents exist within the file that would be relevant to this action."  The court declined to conduct an in camera review of the file and ordered the return of the records to the Sheriff.

¶ 19    Cline filed a motion for reconsideration, essentially arguing that a defendant charged with assaulting a police officer is entitled to automatic disclosure of information regarding "excessive force and dishonesty" under *People v. Walker*, 666 P.2d 113, 122 (Colo. 1983).  The district court denied the motion, reasoning that Cline was not entitled to the subpoenaed documents without meeting the five-part test set forth in *Spykstra,* 234 P.3d at 669.  The court found that Cline "made no showing that evidentiary and material documents relevant to this case exist within the file."

C.   The District Court Did Not Abuse Its Discretion by Quashing
the Subpoena Without Reviewing the Personnel File In Camera

¶ 20    Cline argues that, because he was charged with assaulting a

police officer, the district court was required to conduct an in

camera review of the officer's personnel file and then release to him

any complaints of excessive force and other information in the file

relating to the officer's credibility.  *See Walker*, 666 P.2d at 121-22;

*see also Martinelli v. Dist. Ct.*, 199 Colo. 163, 173, 612 P.2d 1083,

1091 (1980).  He argues that the test articulated in *Spykstra*, on

which the court relied in granting the motion to quash, does not

apply under these circumstances; but even if it did, he made the

requisite showing.  We disagree.

¶ 21    True, *Walker* held that "[a] defendant who is charged with

assaulting a police officer is entitled to disclosure of the fact that

complaints charging excessive use of force have been filed against

the officer involved."  666 P.2d at 121-22.  But *Walker* did not

address what showing a defendant must make to be entitled to an

in camera review of the officer's personnel file, nor did it mandate

that a court must conduct an in camera review any time a

defendant asks for an officer's personnel file.  *Id.*  Rather, the trial

court in *Walker* had already conducted an in camera review of the officer's personnel file but had declined to disclose certain complaints charging excessive force and untruthfulness because they had not been "sustained" and declined to disclose other such complaints because they would not be admissible at trial. *Id.* at 121. Rejecting the distinctions drawn by the trial court, the supreme court explained that "[i]nformation in such complaints, whether sustained or unsustained, could be relevant to the issues in [the] case." *Id.* The supreme court thus instructed the trial court on remand to conduct an in camera review and to disclose information "in accordance with the standards announced in *Martinelli*." *Id.* at 122.

¶ 22    Almost thirty years later, in *Spykstra,* the supreme court articulated a multi-factor test to aid trial courts in determining whether to quash a third-party subpoena because it is unreasonable or oppressive:

> [W]hen a criminal pretrial third-party subpoena is challenged, a defendant must demonstrate:
>
> (1) A reasonable likelihood that the subpoenaed materials exist, by setting forth a specific factual basis;

(2) That the materials are evidentiary and relevant;

(3) That the materials are not otherwise procurable reasonably in advance of trial by the exercise of due diligence;

(4) That the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and

(5) That the application is made in good faith and is not intended as a general fishing expedition.

234 P.3d at 669; *see also* Crim. P. 17(c).

¶ 23   The supreme court explained that, in addition to this five-part test, subpoenas issued for materials that may be protected by a privilege or a right to confidentiality require the court to balance the parties' competing interests. *Spykstra*, 234 P.3d at 670. And, "[i]n such circumstances, the defendant must make a greater showing of need and, in fact, might not gain access to otherwise material information depending on the nature of the interest against disclosure." *Id.*

¶ 24   Though the supreme court recognized that, once a defendant makes the required initial showing, an in camera review may be helpful in balancing the parties' competing interests, it also

explicitly held that in camera review of subpoenaed documents was not automatically required: "We do not, however, adopt a mandate of in camera review, although such review may in some instances be necessary in the interest of due process." *Id.*

¶ 25    Referring us back to *Walker,* Cline attempts to equate *Spykstra*'s acknowledgment of the usefulness of in camera reviews with a mandate for in camera reviews when police officer personnel files are at issue. We do not read *Spykstra* the same way. Although police officer personnel files were not at issue in *Spykstra,* the court did not exempt such files from the five-factor test and it did not mandate in camera reviews for such files simply because a defendant charged with assaulting a police officer requested them. And we know the *Spykstra* court was aware of *Walker.* Indeed, it cited *Walker* in reference to the requirement that a defendant make a "greater showing of need" when the requested materials may be protected by a right to confidentiality. *Spykstra,* 234 P.3d at 670 (citing *Walker,* 666 P.2d at 122). Had the supreme court wished to absolve defendants charged with assaulting a police officer from making the showing required under the test it articulated to obtain the officer's personnel file, it would have said so.

¶ 26     Thus, a trial court is not required to conduct an in camera review of documents subpoenaed by a defendant in a criminal case before determining whether the documents should be produced to the defense. *Battigalli-Ansell*, ¶ 79. And if a defendant fails to make the initial showing required by *Spykstra*, the court does not abuse its discretion by declining to conduct an in camera review before quashing the subpoena. *See id.* at ¶ 80.

¶ 27     Here, the district court quashed the subpoena Cline issued for Deputy Draughon's personnel file because Cline failed to make the first showing required by *Spykstra*: "A reasonable likelihood that the subpoenaed materials exist, by setting forth a specific factual basis." 234 P.3d at 669. Cline did not articulate any factual basis for believing that Deputy Draughon's personnel file includes complaints of excessive force or dishonesty. His claim that such documents exist was mere speculation. "It is the moving party's responsibility — not the court's — to independently conduct [his] own investigation and present witnesses or documents that demonstrate the likelihood that the evidence [he] intends to bring to court through Crim. P. 17(c) in fact exists." *Id.* at 672.

¶ 28    On this record, we conclude the court did not abuse its discretion by not conducting an in camera review of Deputy Draughon's personnel file before granting the Sheriff's motion to quash.

### III.    Jury Instructions

¶ 29    Cline contends that the district court erred by (1) refusing to instruct the jury on the force-against-intruders defense; (2) instructing the jury on the initial aggressor exception to self-defense; and (3) refusing to instruct the jury on the reasonable mistake of fact defense. We reject each of these contentions.

### A.    Standard of Review

¶ 30    The trial court has a duty to correctly instruct the jury on the applicable law when there is sufficient evidence to support giving an instruction. *Castillo v. People*, 2018 CO 62, ¶ 34. We review de novo whether the instructions accurately informed the jury of the law. *Pearson v. People*, 2022 CO 4, ¶ 15.

¶ 31    A defendant is entitled to a jury instruction on a defense if "some credible evidence" supports it. *Galvan v. People*, 2020 CO 82, ¶ 24 (quoting the affirmative defense statute, § 18-1-407(1), C.R.S. 2022) ("[O]ur appellate courts have understood 'some

credible evidence' to be interchangeable with 'some evidence,' 'any credible [even if highly improbable] evidence,' 'a scintilla of evidence,' a 'small quantum of evidence,' and 'any evidence.'"). We review de novo whether there was sufficient evidence to support giving an instruction on a claimed defense. *People v. Garcia*, 113 P.3d 775, 784 (Colo. 2005).

¶ 32    We review a trial court's decision whether to give a particular jury instruction for an abuse of discretion. *People v. Payne*, 2019 COA 167, ¶ 16.

### B.    The District Court Did Not Err by Declining to Instruct the Jury on the Force-Against-Intruders Defense

¶ 33    Cline contends that the district court erred by refusing to instruct the jury in the assault trial on the force-against-intruders defense. We conclude that no credible evidence supported the instruction, so the court did not err by refusing it.

¶ 34    The force-against-intruders statute provides as follows:

> Notwithstanding the provisions of section 18-1-704[, C.R.S. 2022, the self-defense statute], any occupant of a dwelling is justified in using any degree of physical force, including deadly physical force, against another person when that other person has made an unlawful entry into the dwelling, and when the occupant has a reasonable belief that such other person

14

has committed a crime in the dwelling in addition to the uninvited entry, or is committing or intends to commit a crime against a person or property in addition to the uninvited entry, and when the occupant reasonably believes that such other person might use any physical force, no matter how slight, against any occupant.

§ 18-1-704.5(2). The dispute in this case centers on whether the officers made an "unlawful entry" into Cline's residence.

¶ 35 Cline does not dispute that he invited the deputies inside, but he argues his invitation was coerced or involuntary based on the totality of the circumstances (i.e., Cline's intoxication, the deputies' tone and use of their "color of authority," and the time). Cline essentially asks us to conclude that an entry premised upon a coerced invitation is an unlawful entry. To bolster his argument, Cline relies heavily on the district court's suppression order.

¶ 36 But the suppression order addressed whether there had been a Fourth Amendment violation based on an "unlawful seizure" of Cline rather than an "unlawful entry" by the deputies into Cline's home for purposes of the force-against-intruders statute. In that order, the court first found that the deputies' commands to Cline to open his door under the color of their authority constituted an

15

unlawful seizure. Then the court found "by clear and convincing evidence that [Cline] voluntarily opened the door and consented to the deputies entering his home." In the end, though, the court found that Cline's consent was not sufficiently attenuated from the unlawful seizure for the evidence obtained after entry (Cline's statements and the deputies' observations) to be admissible. Because "[t]he deputies obtained consent to enter the home through the exploitation of their initial unlawful seizure," the evidence obtained was inadmissible as "the unlawful fruit of" that constitutional violation.

¶ 37 Still, the court continued to analyze the scope of suppression in light of Cline's intervening assault on Deputy Draughon and decided to sever the burglary charges from the assault charges so that evidence obtained after the entry into Cline's home could be suppressed in the burglary trial but admitted in the assault trial. True, in this latter context, the court referred to the constitutional violation as an "illegal entry" and an "unlawful entry," but the court's rationale makes clear that the illegality with which it was concerned was the seizure of Cline.

¶ 38   Importantly, whether there was a Fourth Amendment violation and whether there was an "unlawful entry" for purposes of the force-against-intruders defense are two separate inquiries. And Cline's argument ultimately fails because, when we consider the correct definition of "unlawful entry" for purposes of the force-against-intruders defense, the instruction he requested was not supported by the evidence.

¶ 39   *McNeese* defines "unlawful entry" in the context of the force-against-intruders statute as "a knowing, criminal entry into a dwelling." 892 P.2d at 310. An "unlawful entry" requires a "culpable mental state." *Id.* at 311. More specifically, "[t]he intruder's mental state must reflect an entry in knowing violation of the criminal code." *Id.* at 312. So, under *McNeese*, there had to be some evidence that the deputies engaged in conduct they knew violated the criminal code by entering Cline's home at his invitation before the district court would have been required to give a force-against-intruders instruction. *Id.* at 310 (alternatively describing this element as requiring "an entry in knowing violation of the criminal law").

¶ 40     At trial, both deputies testified they had no intention of entering Cline's home before he invited them in. Deputy Draughon testified that he did not have an arrest or search warrant. He also said that no exigent circumstances existed, and he would not have gone into Cline's home without Cline's permission. And the jury saw the bodycam footage, which reflected Cline casually asking the deputies, "Why don't you guys come in?"

¶ 41     Based on this evidence, the district court denied Cline's force-against-intruders instruction, finding no evidence to support "any knowing unlawful entry." The court found that Cline invited the deputies inside and the deputies did not enter Cline's home until Cline asked them to come in. The court also explained (as we have) that its previous suppression order addressed a different question — whether Cline was unlawfully seized under the Fourth Amendment, not whether there was an unlawful entry under the force-against-intruders statute.

¶ 42     We are bound by the supreme court's definition of "unlawful entry." *See id.* at 311-12; *see also People v. Cox*, 2021 COA 68, ¶ 8 ("Both this court and the trial court are bound by supreme court decisions."). Cline does not explain what provision of the criminal

code the deputies violated by entering his home or point to evidence in the record from which a reasonable jury could conclude that the deputies *knowingly* committed a criminal offense under the circumstances.

¶ 43 Still, Cline urges us to follow *Zukowski*, in which a division of this court held that a force-against-intruders jury instruction that stated, in relevant part, that "the other person's unlawful entry into the dwelling must have been made in knowing violation of the criminal law," was misleading because it suggested that "an intruder must know that [their] conduct violates a criminal statute, rather than that the intruder must not have a reasonable belief that [their] entry is licensed, invited, or otherwise privileged." 260 P.3d at 344. The division based its conclusion on section 18-4-201(3), C.R.S. 2022, which provides that a person "enters unlawfully" when the person "is not licensed, invited, or otherwise privileged to do so." Thus, it attempted to narrow *McNeese*'s definition: "[I]t appears that the phrase ['in knowing violation of the criminal law'] was intended to express a requirement that an intruder must knowingly engage in criminal conduct, not that an intruder knows [they are] violating

19

a criminal statute." *Zukowski*, 260 P.3d at 344 (quoting *McNeese*, 892 P.2d at 310).

¶ 44    For two reasons we are not persuaded by *Zukowski*. *See Chavez v. Chavez*, 2020 COA 70, ¶ 13 (explaining that one division of the court of appeals is not bound by another).

¶ 45    First, the *McNeese* definition of "unlawful entry" was not based upon section 18-4-201(3). 892 P.2d at 311-12. That statute defines "enters unlawfully" specifically for purposes of Title 18, Article 4, Offenses Against Property, but the force-against-intruders defense is set forth in Article 1, Provisions Applicable to Offenses Generally. § 18-4-201 (preceding the definition by "[a]s used in this article"). More importantly, we can presume that the majority in *McNeese* considered and declined to adopt that definition because Chief Justice Rovira specifically cited it when dissenting from the majority's definition. 892 P.2d at 315 (Rovira, C.J., concurring in the result and dissenting in part).

¶ 46    Second, even applying the *Zukowski* definition, there was no record evidence that the deputies "knowingly engage[d] in criminal conduct" or even that they lacked a reasonable belief that their entry was invited. *See Zukowski*, 260 P.3d at 344. As the district

court found by clear and convincing evidence after the suppression hearing, Cline "voluntarily opened the door and consented to the deputies entering his home."

¶ 47    On this record, we conclude that there was no credible evidence that the deputies made an unlawful entry, as the Colorado Supreme Court has defined that term in this context. Thus, we perceive no error by the district court in refusing to instruct the jury on the force-against-intruders defense.

### C.    The District Court Did Not Err by Instructing the Jury on the Initial Aggressor Exception to Self-Defense

¶ 48    Cline contends that the district court erred by instructing the jury in the assault trial on the initial aggressor exception to self-defense because there was no evidence that he initiated the physical conflict. Cline argues that he either acted in self-defense or committed assault. Either way, Cline contends, an instruction on initial aggressor was not warranted. We conclude that the evidence would support a jury finding that Cline was the initial aggressor of the physical conflict when he kicked Deputy Draughon.

¶ 49    Under section 18-1-704(1), "a person is justified in using physical force upon another person in order to defend himself . . .

21

from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person." But a person is not justified in using physical force if he is the "initial aggressor." § 18-1-704(3)(b). "A court may give an initial aggressor instruction if the evidence will support a reasonable inference that the defendant initiated the physical conflict by using or threatening the imminent use of unlawful physical force." *People v. Griffin*, 224 P.3d 292, 300 (Colo. App. 2009); *see also Castillo*, ¶ 41.

¶ 50 Cline argues that he did not use or threaten to use imminent force before acting in self-defense. He asserts that it was undisputed that he kicked Deputy Draughon only *after* the deputies took him to the ground, so there was no evidence that he *initiated* the physical conflict. Cline likens his situation to *Castillo*, ¶¶ 46-53, and *People v. Manzanares*, 942 P.2d 1235, 1238-41 (Colo. App. 1996). These cases are distinguishable.

¶ 51 In *Castillo*, the supreme court concluded that there was no evidentiary basis for giving an initial aggressor instruction. *Castillo*, ¶¶ 49-53. Castillo tried to leave a parking lot when an unknown assailant opened fire. *Id.* at ¶ 1. Castillo got out of his car, retrieved a shotgun from his trunk, and returned fire. *Id.* Nearby

police officers rushed to the scene and began firing at Castillo. *Id.* at ¶ 16. Castillo shot at the police after they fired at him. *Id.* at ¶ 47 n.7. The trial court justified the initial aggressor instruction by pointing to Castillo's racking of the gun before the police fired as an act of initial aggression. *Id.* at ¶ 46. However, the supreme court concluded that the events constituted "one continuous episode" that began when an unknown person first shot at Castillo. *Id.* at ¶ 47. The court reasoned that the entire episode lasted a matter of seconds; it could not be separated into segments such that Castillo became the initial aggressor as to the second segment involving the police. *Id.* It concluded that Castillo had not used or threatened the use of imminent force before he was fired upon, so no evidence supported an initial aggressor instruction. *Id.* at ¶¶ 52-53.

¶ 52    Unlike in *Castillo*, where the entire series of events transpired in "a matter of seconds, with no break in the action," *id.* at ¶ 48, the events in this case lasted several minutes with multiple breaks in the action. The events were not necessarily "one unit of experience," so the jury need not have determined whether Cline

23

was the initial aggressor "as to the entire episode." *See id.* at ¶¶ 48-49.  As the district court recognized,

> [t]here is some lack of clarity regarding the exact sequence of events.  The jury could find . . . that the initial . . . contact between Mr. Cline and law enforcement . . . did not constitute unreasonable or excessive force, and . . . they could certainly find that Mr. Cline . . . basically first struck the deputy, making him the initial aggressor.

¶ 53     In *Manzanares*, a division of this court concluded that there was no evidentiary basis for giving an initial aggressor instruction.  942 P.2d at 1238, 1241.  Manzanares was at a party when one of his friends became involved in an altercation.  *Id.* at 1238.  Manzanares drove away but then returned and fired a handgun.  *Id.*  It was undisputed that Manzanares was not part of the initial altercation, so the division reasoned that "the only issue remaining upon defendant's return to the party was whether, by firing his pistol, he committed any of the crimes charged and, if so, whether the conduct was justified because he had acted in self-defense."  *Id.* at 1241.  The division explained that a finding by the jury that Manzanares was the initial aggressor when he fired his gun would be no more than a rejection of his claim of self-defense.  *Id.*  Under

such circumstances, the trial court erred by giving the jury an initial aggressor instruction. *Id.*

¶ 54     Unlike in *Manzanares*, where the defendant engaged in a single act (firing a gun) that gave rise to the charged offenses, *see id.* at 1238, Cline was alleged to have engaged in sequential assaultive acts — the kick and the genital grab. If the kick had been the only conduct chargeable as assault, Cline's case would be more like *Manzanares*. In that scenario, a jury would have to decide only whether Cline was justified in kicking Deputy Draughon because he acted in self-defense. The kick was either self-defense or it was assault. In that scenario, an initial aggressor instruction may not have been warranted.

¶ 55     But *after* Cline started kicking, Deputy Draughon punched him and put him in a chokehold. Cline sought to justify grabbing Deputy Draughon's genitals as self-defense to the chokehold and punching. In that scenario, which was supported by the evidence at trial, the jury could find that Cline grabbed Deputy Draughon's genitals in self-defense *but also* that Cline was the initial aggressor because he initiated the physical conflict by kicking Deputy

Draughon. Under these circumstances, Cline would not be entitled to claim self-defense as to the genital grab.

¶ 56     On this record, we conclude that there was sufficient evidence to support the district court instructing the jury on the initial aggressor exception to self-defense.

### D.     The District Court Did Not Err by Declining to Instruct the Jury on the Mistake of Fact Defense

¶ 57     Cline contends that the district court erred by refusing to instruct the jury in the burglary trial on mistake of fact as a defense to criminal trespass. Cline argues that (1) mistake of fact was an affirmative defense on which he was entitled to have the jury instructed; (2) even if the defense was a traverse, the court should have given the instruction; and (3) the elemental trespass instruction failed to adequately articulate the People's burden to prove Cline knowingly entered someone else's home. We are not persuaded.

¶ 58     Cline was convicted of one count of first degree trespass. A person commits first degree criminal trespass if such a person "[k]nowingly and unlawfully enters or remains in a dwelling of another." § 18-4-502(1)(a), C.R.S. 2022. As relevant here, "[a]

26

person is not relieved of criminal liability for conduct because he engaged in that conduct under a mistaken belief of fact, unless . . . [i]t negatives the existence of a particular mental state essential to the commission of the offense." § 18-1-504(1)(a), C.R.S. 2022. This mistake of fact defense is "an affirmative defense." § 18-1-504(3).

¶ 59 Cline offered a jury instruction at trial that provided, in relevant part, as follows:

> The evidence presented in this case has raised the affirmative defense of "mistaken belief of fact[.]"
>
> The defendant's conduct was legally authorized if:
>
>> 1. the defendant engaged in the prohibited conduct under a mistaken belief, and
>>
>> 2. due to this mistaken belief he did not form the particular mental state required in order to commit the offense.

¶ 60 The district court rejected Cline's instruction but gave an elemental instruction on trespass that provided, in relevant part, as follows:

> The elements of First Degree Criminal Trespass are:
>
> 1.    That the defendant,

2.    in the State of Colorado, at or about the date and place charged,

3.    knowingly, and

4.    unlawfully,

5.    entered or remained in a dwelling of another.

¶ 61    Given how Cline frames his contentions, a threshold question would seem to be whether Cline's mistake of fact defense is an affirmative defense or a traverse. *See People v. Nelson*, 2014 COA 165, ¶¶ 48-49 (explaining that an affirmative defense admits commission of the charged act but seeks to justify, excuse, or mitigate it, while a traverse negates an element of the offense). But even if the defense was an affirmative defense, which is what the plain language of section 18-1-504(3) provides, Cline was not entitled to a separate jury instruction because the requested instruction only served to negate an element of the offense. *See Nelson*, ¶¶ 51-52 ("Where proof of the elements of the charged offense necessarily requires disproof of the issue raised by the affirmative defense, a separate instruction on that defense need not be given.").

¶ 62    The present case is like *People v. Walden*, 224 P.3d 369, 379 (Colo. App. 2009), where the division concluded that Walden's requested affirmative defense instruction only served to repeat an element of the offense. The division explained that "[t]he effect of defendant's instruction, if the jury were to accept defendant's contention that he was acting under the belief he had permission to enter and stay at his wife's apartment, would merely be to negate the requisite 'knowing' element in the crime of trespass." *Id.* Because the instruction "was unnecessarily duplicative of the elements the prosecution was already required to prove beyond a reasonable doubt" — including that Walden had knowingly entered the victim's apartment without permission — the trial court did not err by declining to instruct the jury on mistake of fact. *Id.*

¶ 63    Like in *Walden*, Cline's mistake of fact instruction was unnecessarily duplicative because the trespass instruction already required that the prosecution prove beyond a reasonable doubt that Cline "knowingly . . . entered or remained in a dwelling of another." Cline argues that *Walden* was wrongly decided, but we are persuaded to follow it. *See Chavez*, ¶ 13. We conclude that the

district court did not abuse its discretion by declining Cline's mistake of fact instruction.

¶ 64     But Cline also contends that the elemental trespass jury instruction was erroneous because it failed to inform the jury that the People had to prove beyond a reasonable doubt that Cline knew he was entering the home of another.  He argues that the jury was inadequately informed of this requirement because "dwelling of another" was not indented or offset.  Reviewing de novo, *see Pearson*, ¶ 15, we disagree.

¶ 65     The elemental trespass instruction accurately set forth the elements of first degree trespass.  Indeed, it tracked the pattern instruction.  *See* COLJI-Crim. 4-5:03 (2021); *People v. Gallegos*, 260 P.3d 15, 26 (Colo. App. 2010) (explaining that instructions that accurately track pattern instructions generally are sufficient).  "Knowingly" is listed as the third element and "unlawfully" is listed as the fourth.  Following the logical flow of the numbered lines, "knowingly" and "unlawfully" necessarily apply to the fifth element, "entered or remained in a dwelling of another," even if the fifth element was not offset and even if "entered" and "dwelling of another" were not separated.

¶ 66    The trespass instruction in this case is unlike the theft instructions in *Auman v. People*, 109 P.3d 647, 664 (Colo. 2005), and *People v. Bornman*, 953 P.2d 952, 954 (Colo. App. 1997), on which Cline relies.  In those cases, the "knowingly" mens rea element preceded some elements that were offset and other elements that were not.  *Auman*, 109 P.3d at 664; *Bornman*, 953 P.2d at 954.  Essentially, the courts in those cases concluded that the instructions were erroneous because "knowingly" should have applied both to the elements that were offset and to those that were not, but the difference in formatting suggested that the mens rea did not apply to the elements that were not offset.  Here, no elements were offset.  We conclude that the trespass instruction accurately conveyed the elements of the offense.

## IV.    Expert Testimony

¶ 67    Finally, Cline contends that the district court abused its discretion and violated his constitutional right to present a defense by precluding his expert witness from testifying that the deputies' use of the taser on Cline and their physical transport of Cline to the patrol car were not reasonable or appropriate.  We disagree.

## A. Standard of Review

¶ 68    We review a trial court's decision whether to admit expert testimony for an abuse of discretion. *People v. Rector*, 248 P.3d 1196, 1200 (Colo. 2011). A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or if it misconstrues or misapplies the law. *Id.*; *People v. Gee*, 2015 COA 151, ¶ 23.

¶ 69    CRE 702 allows for the admission of qualified expert opinion testimony if it will assist the trier of fact to understand the evidence or to determine a fact in issue. The focus of a CRE 702 inquiry is on whether the proffered evidence is both reliable and relevant. *People v. Cooper*, 2021 CO 69, ¶ 1; *People v. Shreck*, 22 P.3d 68, 77 (Colo. 2001).

¶ 70    An erroneous evidentiary ruling may rise to the level of a constitutional error if it deprived the defendant of a meaningful opportunity to present a complete defense. *People v. Conyac*, 2014 COA 8M, ¶ 93; *see also Krutsinger v. People*, 219 P.3d 1054, 1061 (Colo. 2009). But the right to present a defense "is violated only where the defendant was denied virtually his only means of effectively testing significant prosecution evidence." *Conyac*, ¶ 93.

## B.    Additional Background

¶ 71    Prior to trial, Cline endorsed a former police chief as an expert

witness who proposed to testify to three categories of opinions:

> [1]  The handcuffing of Mr. Cline and forcefully placing him on the floor of the residence was not reasonable and appropriate.  Mr. Cline was not acting in an "aggressive manner" and was not an "officer safety" concern.  There was no need to forcefully handcuff him and place him on the floor, and there was no need apply a wrist lock as a pain compliance tool.  Furthermore, the strikes to Mr. Cline's face by Deputy Draughon to a handcuffed prisoner were not reasonable and appropriate.  Strikes to the face and head can cause very serious injuries externally and can cause brain damage.

> [2]  Using a [taser] in the "drive stun" mode on Mr. Cline while he was handcuffed and on his back with his hands behind him was not reasonable and appropriate.  In the "drive stun" mode the [taser] does not create neuro-muscular incapacitation (NMI) and only creates excruciating pain.

> [3]  Deputies Draughon and Christensen attempted to get Mr. Cline to stand up from being in a prone position on his stomach while handcuffed with his hands behind him, and in so doing they lifted both of his arms upwards.  This is not the proper technique for getting a prisoner up off the ground and is not reasonable or appropriate.  This technique creates excruciating pain and can cause injuries to the upper arms and/or shoulders.

¶ 72    In a pretrial ruling, the district court allowed the expert to testify regarding only the first category. It ruled that the second and third categories were irrelevant because the police conduct at issue happened after Deputy Draughon allegedly used unreasonable force against Cline and after Cline allegedly acted in self-defense.

¶ 73    At trial, defense counsel cross-examined the prosecution's expert witness — who was qualified "in the field of self-defense, arrest control, and use of force" — regarding levels of force an officer can use, the tools available for officers exercising force at different levels (e.g., physical presence, verbal commands, hands on tactics, weapons, etc.), force escalation, arrest control, and officer emotion regulation. Among other things, defense counsel asked the prosecution expert to explain the difference in the use of tasers in "drive stun" mode, which causes excruciating pain, and "deployment mode," which causes neuromuscular incapacitation.

¶ 74    Cline's attorney then called the defense expert witness, who was qualified as an expert in "police practices for arrest control and use of force." The defense expert's testimony served as a critique of many aspects of Deputy Draughon's and Deputy Christensen's

34

conduct during the encounter with Cline.  As relevant to this issue, the expert testified similarly to the prosecution expert about the two ways to use a taser — to cause neuromuscular incapacitation or to cause "an excruciatingly painful zap."  He also testified about the concepts of "emotional capture" — when an officer has an adrenaline overload and overreacts — and "contempt of cop" — where an officer arrests a person because the officer is angry that the person is not obeying the officer's commands.  The expert opined that the reasonableness of an officer's actions can be determined by assessing the proportionality of the response to the level of resistance.

### C.  The District Court Did Not Abuse Its Discretion by Limiting the Defense Expert's Testimony

¶ 75 Cline contends that the expert testimony the district court excluded was relevant to his theory of self-defense because it showed that Deputy Draughon overreacted at every step, used excessive force, and escalated the entire situation.[3]  Cline also

---

[3] We decline to address Cline's argument that the expert testimony was also relevant to the totality of the circumstances regarding the harassment and criminal mischief charges because Cline raises that argument for the first time in his reply brief.  *See People v.*

contends that the testimony would not have been unfairly prejudicial because the jury heard and saw evidence of the entire encounter — from the deputies knocking on Cline's door to the deputies taking Cline to the patrol car.

¶ 76     But Cline does not dispute that the deputies' tasing him and standing him up by his arms occurred after Cline kicked Deputy Draughon and grabbed the deputy's genitals.  Evaluating the deputies' conduct *after* Cline's alleged assault would have done nothing to assist the jury in deciding whether Cline's conduct was justified by what came *before* it.  In other words, the evidence would not have made it more or less probable that Cline had acted in self-defense.  *See* CRE 401.  So we perceive no abuse of discretion in the district court's ruling that the challenged evidence was not relevant.[4]

¶ 77     We also reject Cline's contention that the district court's limitation on his expert's testimony abridged his constitutional right

---

*Czemerynski,* 786 P.2d 1100, 1107 (Colo. 1990) (noting issues raised for the first time in the reply brief will not be considered).
[4] Because the court did not err by excluding the evidence as irrelevant, *see* CRE 402, we need not decide whether it erred by ruling that the evidence was also inadmissible under CRE 403, as Cline alternatively contends.

to present a defense. "[T]he right to present a defense is not absolute and may be conditioned upon adherence to the rules of evidence." *People v. Rodriguez,* 209 P.3d 1151, 1161 (Colo. App. 2008), *aff'd,* 238 P.3d 1283 (Colo. 2010). Although an erroneous evidentiary ruling may deprive a defendant of the constitutional right to present a complete defense, *Conyac,* ¶ 93, we have found no error here.

¶ 78    Moreover, not "every restriction on a defendant's attempts to challenge the credibility of evidence against him, or even every erroneous evidentiary ruling having that effect," amounts to constitutional error. *Krutsinger,* 219 P.3d at 1062. Rather, a constitutional violation occurs only if the ruling "effectively barred the defendant from meaningfully testing evidence central to establishing his guilt." *Id.* The district court's ruling here had no such effect.

¶ 79    Cline had ample opportunity to present evidence regarding the reasonableness of Deputy Draughon's actions and his alleged use of excessive force, including through cross-examination of Deputy Draughon, cross-examination of the prosecution's expert, and direct and redirect examination of the defense expert. Further, as Cline

admits, the jury saw bodycam evidence of the struggle and could judge for itself whether Deputy Draughon escalated the situation from the outset and overreacted throughout the encounter. Because Cline was not barred from "meaningfully testing" the evidence against him, *Krutsinger*, 219 P.3d at 1062, the court's ruling did not violate his constitutional right to present a defense.

## V. Disposition

¶ 80 We affirm the judgment of conviction.

JUDGE J. JONES and JUDGE KUHN concur.